**PARCEL TANKERS, INC., et al.**

v.

**M/T STOLT LUISA PANDO, her engines, tackle, apparel, etc., in rem, Maritima Antares S.A., in personam, Lisnave Estaleiro Navais de Lisboa S.Q.R.L., et al.**

**Civ. A. Nos. 90–2376, 90–2411, 90–2716 and 91–0386.**

United States District Court, E.D. Louisiana.

Jan. 29, 1992.

Christopher O. Davis, Brian D. Wallace, Bethany Jackson, Phelps Dunbar, New Orleans, La., for Banco Exterior de Espana.

Richard J. Dodson, Law Offices of Richard J. Dodson, Baton Rouge, La., for crew members of M/T STOLT LUISA PANDO, M/T STOLT MARIA PANDO.

Derek A. Walker, Daphne P. McNutt, Chaffe, McCall, Phillips, Toler and Sarpy, New Orleans, La., for Tesoreria General de la Seguridad Social de Espana.

McNAMARA, District Judge.

Before the court in the above-captioned matter is a Motion to Intervene Pursuant to FRCP Rule 24(a)(2), filed on behalf of the former crewmembers of the M/T STOLT LUISA PANDO and the M/T STOLT MARIA PANDO. The Motion is opposed by Banco Exterior de Espana, S.A., the successor banking corporation of Banco de Credito Industrial, S.A., formerly Banco de Credito a la Construccion, S.A. ("BCI"). The Motion has been extensively briefed and was heard at oral argument on January 22, 1992.

The subject vessels were arrested on July 5 and 6, 1990, and sold in September 1990. This court currently holds in its registry funds in excess of $40 million that are the proceeds of those sales. This court has previously adjudicated the rights to those funds among the first mortgage holder (BCI); the second mortgage holder, Hill Samuel Bank Limited ("Hill Samuel"); Tesoreria General de la Seguridad Social de

Espana, the Spanish Social Security administration ("Tesoreria General"), and others, and has found that BCI's claim primes all others, with minor exceptions for custodial expenses and certain "necessaries." *See* Minute Entry of July 25, 1991. Also pending in this same matter are BCI's Motion for Partial Summary Judgment and BCI's Motion to Substitute Security, both of which were set for hearing on January 8, 1992, when the Crewmembers' Motion to Intervene was filed.

On January 3, 1992, on the eve of the hearing concerning substitution of security and distribution of funds—and eighteen months after the vessels were seized, counsel for the crewmembers of the subject vessels filed a Motion to Intervene asserting nonpayment of certain "wages" and that those wage claims primed BCI's claim as first mortgage holder.[1]

The crewmembers assert wage claims against both BCI and Maritima Antares, S.A. Maritima Antares is both the former owner of the seized vessels and former employer of the crewmembers who now seek to intervene. The asserted claims are controlled by two agreements entered into by the crewmembers with BCI, one of July 26, 1990 ("the July Agreement") and one of January 25, 1991 ("the January Agreement"). The claim against Maritima Antares is somewhat more straightforward and will be addressed first.

### The January Agreement

In the early stages of this litigation, BCI recognized that the crewmembers had certain claims against Maritima Antares that potentially primed those of BCI. Therefore, BCI entered into an agreement with the crewmembers, through their union, in which BCI paid the union a sum on the order of $16 million for the release and assignment of all crewmember claims concerning these two vessels and three others owned by the same employer. The union, apparently, in distributing those funds to the individual crewmembers, drew up wage receipts that indicated withholdings for Spanish social security and income tax. Allegedly, these withheld sums were never paid to the appropriate governmental agencies. The crewmembers, through counsel, now allege that these purportedly withheld sums (that were purportedly never paid) constituted "wages," that these sums were owed *by BCI* under the agreement, and that, when calculated in light of the United States penalty statute (46 U.S.C. § 10313), these sums now total (at least potentially) more than the $40 million in the registry of the court.

Central, obviously, to a resolution of this dispute is the language of the Agreement entered into between BCI and the crewmembers' union on their behalf. That Agreement was entered into on January 25, 1991, in Madrid, between "the Merchant Marine Syndicate U.G.T. (General Workers' Union)" (hereinafter "the union") and BCI. The union acted "not only in its own name, but also as the representative of the employees of CIA. MARITIMA ANTARES,

1. The court notes that the intervention appears to have been motivated, at least in part, by a letter from a Mr. Jose R. Gandara, dated December 19, 1991, that was apparently circulated to all the crewmembers. It reads, in part:

   Dear Friend:
       In accordance with the information received from a firm of lawyers in the United States, the crewmembers of the vessels STOLT MARIA PANDO and STOLT LUISA PANDO have a right under United States law, to receive an indemnization for the delay in receiving payment of wages, apart from the indemnization and settlement which we already received from BCI.
       We have held a meeting with this lawyer in Santander on 18–12–91 and he has advised that the money derived from the auction of these vessels is *still* on deposit in the U.S.A., pending [the outcome of] this claim; that the possibilities of winning are great and, as you will see from the attached forms, THERE IS NO NEED TO PAY ANY MONEY, since the attorneys work on commission on the basis of a percentage which depends on the result. BCI's Supplemental Opposition to Applicants' Motion to Intervene, Exhibit A. The quoted language is a translation, provided by BCI, of the original Spanish. The court further notes that the relationship between the writer of the letter and counsel for the crewmembers, Mr. Dodson, is unclear. However, the copy of the original Spanish version of the letter, also provided as part of Exhibit A, bears either a rubber stamp or letterhead imprint of "Richard J. Dodson, A Professional Law Corporation." *Id.*

S.A.," *i.e.* on behalf of the crewmembers.[2] No one suggests that the union lacked the authority to so act.[3]

That Agreement is worth quoting at some length. Initially it "Set Forth":

FIRST—That, by virtue of proceedings pursuant to the employment regulation approved by the Resolution of 12–13–90 and adopted by the Provincial Labor Directorate of Cantabria on 12–21–90, the employment relations of CIA. MARITIMA ANTARES, S.A. and its seamen were resolved.

SECOND—That the CIA. MARITIMA ANTARES, S.A. owes said employees, included in the aforementioned proceedings, the amount of 414,931,064 million pesetas[4] for wages up to 12–21–90, [which figure] includes the final liquidation of its debts.

Similarly, CIA. MARITIMA ANTARES, S.A. owes the employees indemnization for the termination of their respective employment agreements, which raises the total amount to 1,339,418,187 million pesetas.[5]

. . . .

THIRD—That BANCO DE CREDITO INDUSTRIAL, S.A. is a creditor of CIA. MARITIMA ANTARES, S.A., having secured its advances with mortgages on the following vessels belonging to the Company, STOLT MARIA PANDO, STOLT LUISA PANDO, ANA PANDO, CHARO PANDO and LAURA PANDO.

FOURTH—In that the aforementioned labor credits owed to the employees have preferred status with respect to the mortgage credits held by BANCO DE CREDITO INDUSTRIAL, S.A. in accordance with the legislation specifically controlling maritime credits [liens], said Bank is interested in acquiring the referenced credits [held by the employees] and, as the employees are in agreement, both parties do so in conformity with the following:

STIPULATIONS

FIRST—The MERCHANT MARINE SYNDICATE U.G.T., in its capacity as representative of the employees of the CIA. MARITIMA ANTARES, S.A., surrenders to BANCO DE CREDITO INDUSTRIAL, S.A. all credits that [the employees] claim against the mentioned Company, the respective amounts of which are set forth in the report.

SECOND—The price for the assignment of each of the indicated credits is that which is set forth in the cited attached report, reaching a total of 1,656,-579,530 pesetas.

Said price will become effective in the following fashion:

a) The amount of 292,596,298 pesetas has been satisified [sic] by the Bank prior to this act.

b) The remainder, a total of 1,413,983,-232 pesetas will be paid by deposit into the regular account no. 22060023.2, that by this act is opened at BANCO DE CREDITO INDUSTRIAL, S.A., Carrera de San Jeronimo, 40 (Madrid), under the name of the MERCHANT MARINE SYNDICATE U.G.T. and which account the MERCHANT MARINE SYNDICATE U.G.T. may use only for the stated purpose of the making payment of the corresponding price for the assignments agreed to in this document.

Transcript of Motion, at 14, lines 15–18.

---

2. This court relies on the English translation of the Agreement, originally confected in Spanish, supplied by BCI. *See* BCI's Opposition to Applicants' Motion to Intervene, Exhibit B. Opposing counsel has made no specific challenge to that translation.

3. The court notes the following exchange with Mr. Dodson, counsel for the crewmembers, at oral argument

THE COURT: Are you suggesting the union didn't have authority to act for these people?

MR. DODSON: No, sir. I think the union clearly has authority to act. . . .

4. The court assumes that the phrase "414,931,-064 million pesetas" is a typographical error in the translation and that the number is, in fact, 414,931,064, not "414,931,064 million," which would be 414,931,064,000,000.

5. The court assumes, as in note 3, *supra*, that this number is, in fact, 1,339,418,187 and not "1,339,418,187 million," which would be 1,339,-418,187,000,000.

THIRD—The assignment of the credits includes all accessory rights, including the privilege or (end of page)

The MERCHANT MARINE SYNDICATE U.G.T., in its indicated representative capacity, is obliged to secure from each of the ceding emloyees [sic], in favor of BANCO DE CREDIT INDUSTRIAL, S.A., all documents necessary to validate said assignment and specifically a letter assigning the credit and recognizing payment for the same, as well as a power of attorney empowering the Bank to claim and exercise on [each employee's] behalf all actions and rights derived from the cited credits. Said power should be granted simultaneously with the transfer by the MERCHANT MARINE SYNDICATE U.G.T. to each employee of the amount paid for the assignment of his respective credit.

FOURTH—Likewise, the MERCHANT MARINE SYNDICATE U.G.T. is obligated to continue the proceedings for salary claims which currently are being pursued in Bordeaux and Amsterdam, following the instructions that BANCO DE CREDITO INDUSTRIAL, S.A. may give in this matter, as well as initiating those actions which [BANCO DE CREDITO INDUSTRIAL, S.A.] may consider appropriate in order to validate the rights derived from the assigned credits.

BCI's Opposition to Applicants' Motion to Intervene, Exhibit B (except for insertions of "[sic]," all brackets appear in the Translation as provided by BCI). The Agreement goes on to establish procedures for returning monies not paid out by the Union within two months, to establish "the Courts and Tribunals of Madrid–Capital" as the forum "for the resolution of all questions arising from this contract," and related matters. *Id.*

The "bottom line," as established at oral argument, is that counsel for the crewmembers reads this contractual agreement to say that BCI "agreed to pay wages, whatever the total was," Transcript of Motion, at 17, and that "wages" includes the disputed Social Security and income tax withholdings. BCI's counsel, on the other hand, reads this contractual agreement to say that BCI "agreed to pay $16 million," period. *Id.* The $16 million figure is the rough equivalent of the 1,656,579,530 pesetas called for under the Agreement.

"[I]t is hornbook contract law that the objectively determined intent of the parties is the relevant guide" in contract interpretation. *M.O.N.T. Boat Rental Services, Inc. v. Union Oil Co. of California*, 613 F.2d 576, 579 (5th Cir.1980). This court finds nothing ambiguous about the subject Agreement. "Whether a written agreement is ambiguous or whether it clearly demonstrates the intent of the parties is a question of law.... Likewise, ... the interpretation of an unambiguous instrument is a question of law." *Shelton v. Exxon Corp.*, 921 F.2d 595 (5th Cir.1991).

This court begins its interpretation of the subject contractual agreement by noting that it says, first, that BCI recognized that certain "labor credits [were] owed to the employees [that] ha[d] preferred status with respect to the mortgage credits held by [BCI]" and that BCI was "interested in acquiring the referenced credits." *See* paragraph "FOURTH" under items "Set Forth" in the Agreement. Secondly, this court reads the Agreement to say that "[t]he price for the assignment ... is ... a total of 1,656,579,530 pesetas." *See* Paragraph "SECOND" under "Stipulations" in the Agreement. Thirdly, this court reads the Agreement to say that that price was to be paid to the union for distribution among the individual crewmembers. *Id.*

It is certainly true that some of the "labor credits" assigned by that Agreement related to wage claims. But the Agreement does *not* say that BCI agrees to assume the responsibility of paying the crewmembers' wages. Rather, it says, translated into popular jargon, that BCI is "buying out" the crewmembers' interest in this lawsuit as to any and all claims against Maritima Antares, and that the crewmembers (or their union representatives) understood and agreed to that. Furthermore, such a reading is thoroughly consistent with the intentions that one would expect of such parties under such circumstances.

Each side was aware of the other's position. The union, on behalf of the crewmembers, was interested in the present.dollars (or pesetas) that could be extracted in exchange for its right to possible future dollars. BCI was interested in protecting its rights as the mortgage holder. There is nothing to suggest that this was not a fair and reasonable bargain.

Counsel for the crewmembers has argued that "the effect of the assignment is far from certain because of the complete lack of knowledge of the Applicants that their social security and income taxes had not been paid." Applicants' Supplemental Memorandum in Response to Questions by Court at Telephonic Hearings of January 23, 1992, at 4. The subjective knowledge of the individual crewmembers is of no moment, however. The Agreement was not negotiated by the crewmembers. Rather, it was negotiated by their union, a sophisticated party, and *after* the intervention and apparent approval by a Spanish governmental agency of the "resolution" of the seamen's "employment relations" with Maritima Antares. *See* paragraph "FIRST" under "Set Forth" section of Agreement of January 25, 1991.

The summary of payments under the Agreement, provided by BCI, indicate that every peseta of the 1,656,579,530 called for by the Agreement was in fact paid. *See* attachment to Exhibit B of BCI's Opposition Memorandum. Counsel for the crewmembers does not .dispute that payments totalling that amount were paid. Rather, his position is that "notwithstanding what the agreement said, that [BCI] had an obligation to pay [the wages]" or, more specifically, the income tax and Social Security withholdings that were apparently indicated on wage receipts ‘received by the crewmembers.[6]

This court, however, finds no reason, under either Spanish or American law, to believe that the Agreement imposed any obligations beyond what it in fact said.

It may be true that the union, in dispersing the funds under the Agreement, drew up "wage receipts" that indicated amounts withheld for income tax and Social Security that were never paid. If that is true, then it would appear to this court that the crewmembers dispute is with the union and not with BCI. Nothing in the plain language of the Agreement between the crewmembers and BCI indicates, even remotely, that the payment involved was only a "net portion" as the crewmembers' counsel has argued. Transcript of Motion, at 5, lines 13–16. Rather, the Agreement clearly says that the crewmembers "surrender[ ] ... all credits that [the employees] claim against the mentioned Company" in exchange for a total payment of 1,656,579,530 pesetas. *See* paragraphs "FIRST" and "SECOND" under "Stipulations" of the subject Agreement.

### The July Agreement

■ The crewmembers have articulated a second claim against BCI, however, that is independent of the January 25, 1991 Agreement. That claim arises from an earlier Agreement of July 26, 1990 ("the July Agreement"). In that July Agreement, BCI was attempting to deal with a "strike action."[7] To do that, BCI paid the workers' wages for the month of June, by "advancing" those wages to the crewmembers'

---

**6.** The following exchange is excerpted from the oral argument:

THE COURT: Mr. Dodson, is it your position that notwithstanding what the agreement said, that they [BCI] had an obligation to pay it, is that your position?

MR. DODSON: Your Honor, that's absolutely correct. The law of Spain requires that the wage receipts each and every month had it on there and it was never paid.

Transcript of Motion, at 12, lines 20–25.

**7.** "[G]iven the situation concerning the Maritima Antares vessels that have been arrested by

various creditors in different ports of the U.S.A., Spain and Europe, it is necessary to look for immediate solutions that would make it possible to solve the problems that have motivated the present strike action, in light of all these things and since BCI has an interest on the vessels[.]" "SET FORTH" paragraph of July 26, 1990 Agreement. Again, the court relies on an English translation of the agreement that was provided by BCI. The agreement was created in Spanish. Opposing counsel has not challenged this translation.

union.[8] As this court understands the matter, from a telephone conference with counsel for BCI and the crewmembers on January 23, 1992, that "advance" totalled 292,-596,298 pesetas (roughly $3 million) and is the amount referenced in sub-paragraph (a) of the "SECOND" paragraph of "Stipulations" in the Agreement of January 25, 1991. On October 25, 1990, that July Agreement was "extended until November 25, 1990," though (according to counsel for BCI at the telephone conference on January 23, 1992) no payment was made in connection with that October extension. Rather, the January 1991 Agreement, in its concern for past wages, reflects, in part, a payment for wages covering the period from June 1990 until the crewmembers "employment relations" were officially "resolved" in proceedings before the Provincial Labor Directorate of Cantabria on December 21, 1990. That is, BCI agreed to pay the crew's wages in June and made a lump payment of 292,596,298 pesetas in connection with the July agreement for that purpose. By an amendment in October, BCI "extended" the July Agreement, with the implication being that BCI would continue to pay the crew's wages. However, BCI made no further payments, allegedly, until the January Agreement. At that time, BCI paid amounts to cover wages up to the "resolution" of "employment relations" on December 21, as well as to cover the assignment of any and all of the crew's other claims against Maritima Antares. The crewmembers, apparently, still received monthly payments and wage receipts through the union. *See* wage receipts attached as Exhibit A to the crewmembers' Memorandum in Support of Motion to Intervene.

Those wage receipts continue to reflect withholding for Spanish income tax and social security. Allegedly, those withhold-

ings were also not paid to the appropriate Spanish governmental agencies. Thus arises the crewmembers' claim against BCI that is independent of their claim against Maritima Antares and independent of the January Agreement.

Though the January Agreement clearly assigned the crew's rights against Maritima Antares, it in no way assigned the crew's rights against BCI itself. The amount of the alleged shortages in income tax and Social Security payments to the Spanish government for the period from June into December, when BCI had assumed the responsibility for paying the crew's wages, may in fact have been the responsibility of BCI. The shortages may also have been the responsibility of the union, which was actually making the disbursements. This court does not, at the moment, have enough information before it to make that determination. The total alleged shortage for that period has been calculated, however, as $328,778, being $70,118 for social security shortages and $258,660 for income tax shortages.[9] Applicants' Memorandum in Support of Motion to File Additional Exhibits and Supplemental Memorandum in Support of Motion to Intervene, at 4–5.

Because this court finds that the penalty provisions of 46 U.S.C. § 10313 are not applicable to this case (*see infra*), this court also finds that the $328,778 figure represents the maximum value of the crewmembers' rights in this action. Accordingly, the intervention will be allowed, but in accordance with the provisions below. BCI will be allowed to include a sum sufficient to cover that potential liability in the bond that it posts with this court, and the court will allow the unencumbered funds to be disbursed.

---

**8.** "BCI, without it implying the assumption of any labor obligation that corresponds to Maritima Antares, S.A., will advance on behalf of this Company the wages owed to the workers for the month of June." Paragraph 1 under "IT IS AGREED" section of July 26, 1990 agreement.

**9.** It must be noted that the possibility also exists, *see infra,* that any claim that may exist for

these amounts in this period may be claims of the government agencies rather than claims of the crewmembers themselves. If that proves to be true, those governmental claims would appear to be outranked by BCI's claim as first mortgage holder, pursuant to the holding of this court's Minute Entry of July 25, 1991.

### The Wage Penalty Statute

■ Since the penalty provisions of 46 U.S.C. § 10313 form the crux of the crewmembers' claims under the proposed intervention, its inapplicability to the facts of this case deserve some elaboration. The statute provides in part, that

> (f) At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier. When a seaman is discharged and final payment of wages is delayed for the period permitted by this subsection, the seaman is entitled at the time of discharge to one-third of the wages due the seaman.

> (g) When payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.

> . . . .

> (i) This section applies to a seaman on a foreign vessel when in a harbor of the United States. The courts are available to the seaman for the enforcement of this section.

46 U.S.C. § 10313.

The statute places obligations on "the master or owner." An earlier section of the statute defines *master* as "the individual having command of a vessel" and *owner* as "the person to whom the vessel belongs." 46 U.S.C. § 10101. No suggestion has been made to this court—indeed it is difficult to imagine that a serious suggestion could be made—that BCI was ever the "master or owner" of either of the subject vessels. BCI was a lender, trying to protect its lender's lien. Neither is there any suggestion, nor does this court see the possibility of any implication, that, by the July Agreement, BCI received any benefit from Maritima Antares in exchange for which it might reasonably be said to have "stepped into the shoes of" Maritima Antares and thereby been exposed to the owner's obligations under the penalty statute.

Furthermore, even if this court were not to hold that the crewmembers assigned any and all of their rights against Maritima Antares to BCI in the January Agreement, this court would find the penalty statute inapplicable to the crewmembers' claims against Maritima Antares for the alleged lack of Social Security and income tax payments to the Spanish government. No authority cited to or located by this court implies such an application for unpaid withholdings. Rather, the purpose of the provision is "to protect [seamen] from the harsh consequences of arbitrary and unscrupulous action[s] of their employers," *American Foreign S.S. Co. v. Matise*, 423 U.S. 150, 96 S.Ct. 410, 416, 46 L.Ed.2d 354 (1975) (quoting *Collie v. Fergusson*, 281 U.S. 52, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930)), in particular, "to ensure that a seaman is not turned ashore with little or no money in his pocket." *Chung, Yong Il v. Overseas Navigation Co. Ltd.*, 774 F.2d 1043 (11th Cir. 1985), *cert. denied*, 475 U.S. 1147, 106 S.Ct. 1802, 90 L.Ed.2d 346 (1986).

In the present case, the seamen were not "turned ashore with little or no money in their pockets." Rather, they have received all the net wages that they were entitled to receive (or they have assigned any claims to their wages due from Maritima Antares to BCI by the January agreement). Furthermore, there is no evidence that the alleged lack of payments to the Spanish Social Security and income tax authorities creates any exposure of the seamen themselves for those shortages or that they will suffer any reduced benefits as a result of them.

On the contrary, translations of Spanish law provided to the court by BCI suggest no such exposure. For example, Article 68 of the Spanish "General Law of the Social Security" is translated to read, in part: *"The employer* that, having made said deduction, does not remit the part of the contribution corresponding to its employees within the appropriate period, *shall incur liability* on their behalf. . . ." BCI's Opposition to Applicants' Motion to Intervene, Exhibit F. Similarly, a portion of the Spanish Tax Regulations relating to income tax withholdings is translated to read: "The passive subjects shall not be responsible

for the failure to remit the withheld amount by the persons or Entities obligated to do so." *Id.*, Exhibit G. Thus, there is no evidence either that the crewmembers are subject to any legal exposure for the alleged shortages or that they will suffer any reduced benefits because of them.[10] Nor has there been any showing that any agency of the Spanish government has in fact made any official move to hold the crewmembers liable for the alleged shortages or to limit their governmental benefits as a result of them.

Further, "the double wage penalty is not triggered merely by a wrongful withholding. The 'without sufficient cause' standard of § 10313(g) requires the unlawful withholding must be arbitrary or unreasonable." *Henry v. S/S Bermuda Star,* 863 F.2d 1225, 1241 n. 70 (5th Cir.1989) (citation omitted). Even if there were a "wrongful withholding," nothing about the circumstances of this controversy suggests that that wrongful withholding would rise to the level of "arbitrary or unreasonable."

Therefore, this court holds that the maximum possible exposure of BCI to the crewmembers in this matter is for the $328,778 allegedly withheld for Social Security and income tax in the period June through December 1990. This court notes again that, based on the information presently available, that exposure, to the extent it exists at all, may in fact be to the Spanish Social Security and income tax agencies themselves, in which case those governmental claims may well be outranked by BCI's first mortgage lien, pursuant to the reasoning of the Minute Entry of July 25, 1991, in which this court established the priorities of the potential claimants.

### The Intervention

Rule 24(a)(2) of the Federal Rules of Civil Procedure provides an absolute right of intervention to non-parties who satisfy certain requirements. The United States Court of Appeals for the Fifth Circuit has

> adhere[d] to the following test: "It is well-settled that to intervene as of right each of the four requirements of the rule must be met: (1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit."

*Mothersill D.I.S.C. Corp. v. Petroleos Mexicanos, S.A.,* 831 F.2d 59, 61 (5th Cir.1987) (quoting *New Orleans Public Service, Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452, 463 (5th Cir.1984) (en banc)) (other citations omitted).

Because this court finds that the crewmembers assigned their interests against Maritima Antares to BCI by the Agreement of January 25, 1990, it must necessarily find that they have *no* "interest relating to the property or transaction which is the subject of [this] action" in so far as the asserted claims are against Maritima Antares. As to the $328,778 claim that relates to withholding during which BCI was allegedly responsible for paying the crew's wages, however, that claim appears to meet the four-part test for interventions of right cited above, and the crew's intervention will be allowed on that limited claim. The court emphasizes, however, that in al-

---

**10.** Counsel for the crewmembers has made general allegations that "[a]pplicants now face the loss of their homes and property in their domicile because of the liability incurred by the wrongful withholding of their wages," Memorandum in Support of Motion to Intervene, at 2, but without supporting evidence. Crewmembers' counsel has also employed an expert in Spanish law who, by affidavit, has testified that "the benefits of an employee *may* get reduced whenever the employer does not pay the Social Security contributions withheld from the em-

ployee," Applicants' Memorandum in Support of Motion to File Additional Exhibits and Supplemental Memorandum in Support of Motion to Intervene (emphasis added), but without more than his own speculation that such would be true under the facts of this case. In any event, this court finds that any such valid claim that may be shown to exist can be adequately covered by the 150% security that will be required in connection with the ruling on the Motion to Substitute Security, *infra.*

lowing the intervention as to that limited claim for $328,778, the court in no way decides the validity of that claim. Rather, the intervention is allowed to provide the intervenors the opportunity to prove that BCI in fact obligated itself to pay the amounts in dispute, that they were not paid, and that the intervenors are the proper parties to demand the payment.

*Motion for Partial Summary Judgment*

As indicated at the outset, this court has also been holding under submission, pending a ruling on this Motion to Intervene, (1) BCI's Motion for Partial Summary Judgment and (2) BCI's Motion to Substitute Security.

■ BCI's Motion for Partial Summary Judgment seeks an *"in rem"* decree entitling it to those funds in the Registry of the Court after satisfaction of the claims which the Court has ruled have preference over BCI's first preferred mortgage lien," pursuant to Rule 56 of the Federal Rules of Civil Procedure and this court's ruling of July 25, 1991, ranking the various claims asserted against the vessels. Subsequent to the filing of that Motion, BCI filed the Motion to Substitute Security, seeking "to substitute a bond in the amount of $17,-400,000 for the funds in the Registry of the Court (believed to be approximately $44,-000,000), in order to secure those remaining claims which might arguably prime BCI's claim." Memorandum in Support of Motion to Substitute Security, at 2. This court's ranking of the potential claimants has already been appealed and it is the possible reversal of that ranking on appeal that BCI offers to secure by bond. BCI lists the following potential claimants:

| | |
|---|---|
| Woodhouse [11] | $    700,000.00 |
| Tesoria General [12] | 2,875,000.00   (approx.) |
| Hill Samuel [13] | 8,000,000.00 |
| Saab [14] | 21,407.45 |
| TOTAL | $11,596,407.45 |

BCI proposes a bond of $17,400,000 to cover all potential claims on appeal, roughly 150% of the total.

The Motion for Partial Summary Judgment is opposed by both Hill Samuel and Woodhouse. Hill Samuel argues that "[w]hat BCI wholly has failed to do is *prove* the amounts, if any, that are secured by a mortgage lien on STOLT LUISA PANDO and/or STOLT MARIA PANDO." Hill Samuel's Memorandum in Opposition to Motion for Partial Summary Judgment of Banco de Credito Industrial, at 1. Hill Samuel suggests that, if put to such proof, BCI's claims would, in fact, be less than the total of all funds in the registry of the

court and that funds would then be available to other claimants.

Under Rule 56(e) of the Federal Rules of Civil Procedure, Hill Samuel has the burden to "set forth specific facts showing that there is a genuine issue for trial," and it may not "rest upon [its] mere allegations." Fed.R.Civ.P. 56(e). In support of this court's prior rulings, it found BCI's representations of the financial particulars to have been substantiated. Hill Samuel, a sophisticated banking institution that has had extensive opportunity for discovery, has failed to come forward with a single, supported factual allegation that would in any way undermine this court's prior rulings.

---

**11.** Woodhouse, Drake & Carey, Ltd. This is a cargo claim.

**12.** The Spanish Social Security agency.

**13.** The second mortgage holder.

**14.** For "inventory usage" charges and others. This claim was the subject of a settlement proposal at the time the Motion was filed.

BCI, on the other hand, makes the reasonable argument that "[a] loan continues to accrue interest on the full principal amount as long as the principal remains unpaid," that "when a bank receives payments from a borrower, it will normally allocate the payments first to interest and only then to principal (assuming the amount of the payment exceeds the interest due)," and that "a creditor (unless otherwise directed) is entitled to allocate funds received from its debtor to the least secured debt." BCI's Supplemental Memorandum in Support of Motion for Partial Summary Judgment, at 2–3 (citing *West of England Ship Owners v. Patriarch S.S. Co.*, 491 F.Supp. 539, 546 (D.Mass.1980), and others). In sum, this court finds Hill Samuel's claim to be unsupported. The court also finds without merit Hill Samuel's argument that Spanish law limits the available interest on ship mortgages in such a way as to limit BCI's claim to something less than all the funds in the registry of the court.

Woodhouse has indicated a willingness to hold its claim in abeyance if provided "appropriate security or, alternatively, ... [if] sufficient funds are left in the registry of the court to satisfy Woodhouse's claims." Woodhouse's Supplemental Memorandum in Opposition, at 3.

Accordingly, BCI's Motion for Partial Summary Judgment will be granted, *subject to* BCI's establishing security in a kind and amount acceptable to the court.

### The Motion to Substitute Security

BCI's Motion to Substitute Security is opposed by Tesoreria General, which requested first that security on its claim be increased by $5 million, Opposition to Plaintiff's Motion to Substitute Security, at 3, and then that the bond "be increased by US$10 million, to $27.4 million, if it is to include all the parties mentioned in BCI's motion to substitute; or if a separate bond is issued for Tesoreria General only, that it be in the amount of US$12 million." Tesoreria General's Supplemental Memorandum in Opposition to Motion to Substitute Security by BCI, at 3–4. Tesoreria General makes its additional request, in part, based on the argument that "[u]nder Spanish law the nonpayment of Social Security contributions is accompanied by interest and penalties, both [of] which continue to accrue until the principal and any accrued interest and penalties have been paid." Opposition to Plaintiff's Motion to Substitute Security, at 1. Tesoreria General's arguments in this respect may have merit, but this court believes that an additional amount of $2 million will be adequate and will cover any judgment that might reasonably be expected.[15]

On the court's own motion, the crewmembers' claim for the Social Security and income tax withholdings allegedly not paid for the June–December 1990 period will be added to the amount to be secured. Adding that $328,778 to the amounts to be secured, as listed by BCI, brings the total to $11,925,185.45. A bond securing 150% of that amount would come to roughly $18,000,000. Adding an additional $2 million to that figure to cover Tesoreria General's claims for penalties and interest brings the total to $20,000,000.

Accordingly,

IT IS ORDERED that the crewmembers' Motion to Intervene is hereby GRANTED to the extent, but only to the extent, that it relates to claims against BCI for the period of June to December 1990 in the amount of $328,778 or thereabouts for Social Security and income tax withholdings allegedly not paid to the appropriate government agencies. IT IS FURTHER ORDERED that,

---

15. The documented potential claims of Tesoreria General are on the order of $3 million. Tesoreria General has filed translations of Spanish penalty and interest regulations that suggest a fine that "cannot exceed 15 million pesetas" (approximately $150,000) and other penalties of 5%, 15%, and 20% depending on the circumstances. In any event, an additional security of $2 million above and beyond the 150% security established under the formula above appears adequate to satisfy any judgment that might reasonably be expected. The court notes that Tesoreria General has alluded to possible penalties due it under 46 U.S.C. § 10313. The court finds that suggestion without merit for many of the same reasons that it finds that statute inapplicable to the other claims in this case. *See supra.*

not later than Friday, February 21, 1992, at 4:00 p.m., the Intervenors will file whatever documents or other evidence, including depositions or further memoranda of law, they deem necessary to prove up their claim for intervention. The court emphasizes that it is not requiring depositions, only that deposition testimony will be accepted. The court further emphasizes that it will only accept evidence directed to claims against BCI for the period June to December 1990. BCI will file any response to the Intervenors' submissions under this Order no later than Friday, February 28, 1992, at 4:00 p.m.

IT IS FURTHER ORDERED that, to the extent that the crewmembers' claim relates to claims against Maritima Antares or to application of the penalty provisions of 46 U.S.C. § 10313 to their claims against BCI, their Motion to Intervene is hereby DENIED.

IT IS FURTHER ORDERED that BCI's Motion for Partial Summary Judgment is hereby GRANTED, *subject to* BCI's establishing security of a type acceptable to the court and in an amount consistent with the following.

IT IS FURTHER ORDERED that BCI's Motion to Substitute Security is hereby GRANTED, entitling BCI to those funds in the Registry of the Court after satisfaction of the claims ruled to have preference over BCI in this court's Minute Entry of July 25, 1991, and after posting an acceptable bond in the amount of $20 million ($20,000,000). BCI will submit an appropriate bond and order for disbursement of funds for this court's consideration and approval.