990 F.2d 827
 1993 A.M.C. 2029, 25 Fed.R.Serv.3d 1042
 BANCO de CREDITO INDUSTRIAL, S.A., Plaintiff-Appellee,
v.
TESORERIA GENERAL de la, SEGURIDAD SOCIAL de
ESPANA,Intervenor-Appellant,
v.
STOLT LUISA PANDO M/T, Defendants.
PARCEL TANKERS, INC., Plaintiff,
and
Banco de Credito Industrial, S.A., Plaintiff-Appellee,
v.
TESORERIA GENERAL de la SEGURIDAD SOCIAL de ESPANA,
Intervenor-Appellant,
v.
STOLT LUISA PANDO M/T, et al., Defendants.
WOODHOUSE DRAKE & CARRY, LTD., Plaintiff,
and
Banco de Credito Industrial, S.A., Plaintiff-Appellee,
v.
TESORERIA GENERAL de la, SEGURIDAD SOCIAL de
ESPANA,Intervenor-Appellant,
v.
STOLT LUISA PANDO M/T, Defendant.
BANCO de CREDITO INDUSTRIAL, S.A., Plaintiff-Appellee,
v.
TESORERIA GENERAL de la SEGURIDAD SOCIAL de ESPANA,
Intervenor-Appellant,
v.
M/T STOLT MARIA PANDO, in rem, et al., Defendants.
BANCO de CREDITO INDUSTRIAL, S.A., Plaintiff-Appellee,
v.
STOLT LUISA PANDO M/T, et al., Defendants,
Felix Acha Fernandez, et al., Crewmembers of Stolt Luisa
Pando M/T, Intervenors-Appellants.
PARCEL TANKERS, INC., Plaintiff,
and
Banco de Credito Industrial, S.A., Plaintiff-Appellee,
v.
STOLT LUISA PANDO M/T, et al., Defendants,
Felix Acha Fernandez, et al., Crewmembers of Stolt Luisa
Pando M/T, Intervenors-Appellants.
BANCO de CREDITO INDUSTRIAL, S.A., Plaintiff-Appellee,
v.
STOLT LUISA PANDO M/T, et al., Defendants,
Felix Acha Fernandez, et al., Crewmembers of Stolt Luisa
Pando M/T, Intervenors-Appellants.
BANCO de CREDITO INDUSTRIAL, S.A., Plaintiff-Appellee,
v.
STOLT LUISA PANDO M/T, et al., Defendants,
Felix Acha Fernandez, et al., Crewmembers of Stolt Luisa
Pando M/T, Intervenors-Appellants.
PARCEL TANKERS, INC., Plaintiff,
and
Banco de Credito Industrial, S.A., Plaintiff-Appellee,
v.
STOLT LUISA PANDO M/T, et al., Defendants,
Felix Acha Fernandez, et al., Crewmembers of Stolt Luisa
Pando M/T, Intervenors-Appellants.
BANCO de CREDITO INDUSTRIAL, S.A., Plaintiff-Appellee,
v.
STOLT LUISA PANDO M/T, et al., Defendants,
Felix Acha Fernandez, et al., Crewmembers of Stolt Luisa
Pando M/T, Intervenors-Appellants.
 Nos. 91-3922, 92-3100 and 92-3298.
 United States Court of Appeals,
Fifth Circuit.
 May 14, 1993.
Rehearing Denied July 19, 1993.
 
 Derek A. Walker, Daphne P. McNutt, Douglas Grundmeyer, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, LA, for Ministerio de Trabajo y Seguridad Soc., Tesoreria Gen., et al.
 Christopher Ogilvie Davis, Phelps Dunbar, Brian D. Wallace, New Orleans, LA, for Banco de Credito Indus. S.A., in 92-3922
 Richard J. Dodson, Richard P. Bullock, Baton Rouge, LA, for appellants in 92-3100 and 92-3298.
 Luther Munford, Jackson, MS, Christopher Ogilvie Davis, Phelps Dunbar, Bethany Jackson, New Orleans, LA, for appellee in 92-3100.
 Luther Munford, Jackson, MS, Christopher Ogilvie Davis, Phelps Dunbar, Brian D. Wallace, New Orleans, LA, for Banco de Credito in 92-3298.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before DUHE and BARKSDALE, Circuit Judges, and HUNTER,[1] District Judge.
 DUHE, Circuit Judge:
 
 
 1
 Two vessels subject to valid mortgages under Spanish law were seized by the mortgage-holder and sold in an American forum. Various claimants sought to intervene and share in the sale proceeds. The district court ascertained the validity of the various claims, and then ranked them. Appellants argue that the district court erred by denying preferred maritime lien status to claims for unpaid social security contributions due an agency of the Spanish government, and by denying a motion to intervene filed by the crewmembers of the seized vessels. We find no reversible error, and affirm.
 
 I. Background and Procedural History
 
 2
 In July 1990, the vessels STOLT LUISA PANDO and STOLT MARIA PANDO were arrested.[2] Both vessels were owned by Maritima Antares, S.A., a Spanish corporation, and were subject to a first preferred ship mortgage held by Banco de Credito Industrial, S.A.[3] ("BCI"), another Spanish entity. These vessels were sold by judicial auction, and over $40 million was placed in the district court's registry.
 
 
 3
 Into this fray ventured Tesoreria General de la Seguridad Social de Espana ("Tesoreria General"), the Spanish Social Security administration. Tesoreria General alleged that Maritima Antares failed to remit to it social security contributions for the seamen employed by Maritima Antares aboard the STOLT LUISA PANDO and the STOLT MARIA PANDO. Tesoreria General attempted to satisfy Maritima's obligation out of the sale proceeds deposited in the court's registry.
 
 
 4
 Also seeking access to these funds were crewmembers who had served aboard the respective ships.[4] The crewmen asserted that they were entitled to a "preferred maritime lien" for wages due them. See 46 U.S.C. § 31301(5)(D) (Supp.1992).[5] Preferred maritime liens "prime" or outrank a preferred ship mortgage. Id. at § 31326(b)(1). If the seamen's wage claim was permitted, it would take priority over BCI's vessel mortgage.
 
 
 5
 The district court allowed only partial intervention. Crewmembers were permitted to assert claims they may have against BCI for monies withheld by Maritima but not remitted to the appropriate agencies of the Spanish government. The district court, however, denied the seamen's request to assert claims against Maritima Antares and the sale proceeds. The crewmembers were given a deadline within which to file materials to support a claim against BCI. When this deadline passed without any action by the crewmembers, the court dismissed the crewmembers' intervention request in its entirety. The crewmembers now urge us to find that the district court's decision went beyond the dictates of Federal Rule Civil Procedure 24,[6] and that intervention against the sale proceeds should have been permitted.
 
 
 6
 The district court also held that BCI's ship mortgage was a "preferred mortgage" under 46 U.S.C. § 31301(6)(B).[7] In an attempt to prime BCI's preferred ship mortgage, Tesoreria General asserted that its claim for unpaid social security contributions was in the same preferred category and entitled to the same status as claims for crew wages. The district court concluded that the law of Spain governed the "validity and substance" of Tesoreria General's lien claim because that lien, if any, would have to be created under Spanish law. Neither party contests the application of Spanish law to this issue. Tesoreria General contends that the district court incorrectly determined that Spain does not accord lien status, similar to a claim for wages, to unpaid social security contributions.
 
 II. Crewmembers' Claims
 
 7
 The district court held that the crewmen did not have an "interest relating to the property or transaction," as required in Rule 24, at least with regard to accessing sale proceeds held by the court. See Fed.R.Civ.P. 24(a)(2). It found that the crewmen assigned any wage claims they may have had against Maritima Antares to BCI by virtue of a January 1991 agreement negotiated between BCI and the seamen's representative, the Merchant Marine Syndicate U.G.T. ("the Union").
 
 
 8
 The de novo standard governs our review of the crewmens' intervention request. See United States v. Texas Eastern Transmission Corp., 923 F.2d 410, 413 (5th Cir.1991); Mothersill D.I.S.C. Corp. v. Petroleos Mexicanos, S.A., 831 F.2d 59, 61-62 (5th Cir.1987). Our review of the district court's interpretation of the January 1991 agreement is also de novo. Shelton v. Exxon Corp., 921 F.2d 595, 602 (5th Cir.1991).
 
 
 9
 The crewmens' right to intervene turns on whether or not the January 1991 agreement between the Union and BCI abrogated potential wage claims the crewmen could assert against Maritima Antares. If the district court was correct in concluding that, by virtue of the January 1991 agreement, the crewmembers assigned all wage claims to BCI, the seamen do not possess the necessary interest in the controversy to support intervention of right. See Fed.R.Civ.P. 24(a)(2); New Orleans Public Service, Inc. v. United Gas Pipe Line Co., 732 F.2d 452, 466 (5th Cir.) (en banc), cert. denied, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984).
 
 
 10
 Like the district court, we find nothing ambiguous about the January 1991 agreement. In its opening paragraph, the Merchant Marine Syndicate U.G.T. indicates that it is acting in a representative capacity on behalf of the employees of Maritima Antares, S.A. See Case No. 92-3100 R. vol. 1, at 74.[8] The latter provisions of the agreement clearly evince the intent of the parties:
 
 
 11
 FIRST--That, by virtue of proceedings pursuant to the employment regulation approved by the Resolution of 12-13-90 and adopted by the Provincial Labor Directorate of Cantabria on 12-21-90, the employment relations of CIA. MARITIMA ANTARES, S.A. and its seamen were resolved.
 
 
 12
 SECOND--That the CIA. MARITIMA ANTARES, S.A. owes said employees, included in the aforementioned proceedings, the amount of 414,931,064 million pesetas for wages up to 12-21-90, [which figure] includes the final liquidation of its debts.
 
 
 13
 * * * * * *
 
 
 14
 THIRD--That BANCO DE CREDITO INDUSTRIAL, S.A. is a creditor of CIA. MARITIMA ANTARES, S.A., having secured its advances with mortgages on the following vessels belonging to the company, STOLT MARIA PANDO, STOLT LUISA PANDO....
 
 
 15
 FOURTH--In that the aforementioned labor credits owed to the employees have preferred status with respect to the mortgage credits held by BANCO DE CREDITO INDUSTRIAL, S.A. in accordance with the legislation specifically controlling maritime credits [liens], said Bank is interested in acquiring the referenced credits [held by the employees] and, as the employees are in agreement, both parties do so in conformity with the following[.]
 
 
 16
 Id. at 74-75.
 
 
 17
 From the foregoing, it is evident that both parties were aware they were bringing the matter to a conclusion: the employment relations between Maritima Antares and the seamen were "resolved," and this resolution was approved by the Provincial Labor Directorate. BCA acquired the labor credits, because they "have preferred status with respect to the mortgage credits held by [BCI]...." We agree with the district court that the January 1991 agreement was a "buy-out" of the seamen's potential wage claims to protect the rank of the BCI mortgage. Cf. 46 U.S.C. § 31305 (Supp.1992) (ability of lien holder to waive and subordinate rights). The contract conclusively shows that this was the parties' intent. "When interpreting the meaning of a contract it is the objective, and not the subjective intent of the parties which controls. When a contract is unambiguous, the instrument alone is taken to express the intent of the parties." Swaminathan v. Swiss Air Transport Co., Ltd., 962 F.2d 387, 389 (5th Cir.1992); see Shelton v. Exxon Corp., 921 F.2d 595, 603 (5th Cir.1991).[9]
 
 
 18
 The January 1991 agreement usurped any claim to the sale proceeds that the crewmembers might have had. Therefore, we conclude that the crewmembers have no basis to claim intervention of right. Rule 24(a)(2) provides non-parties with a means of intervening in an ongoing dispute only if the applicant has an interest relating to the property or transaction which is the subject of the action. See Mothersill D.I.S.C. Corp., 831 F.2d at 61; see also New Orleans Public Service, Inc., 732 F.2d at 466 ("[A] legally protected interest is required for intervention under Rule 24(a)(2), and such intervention is improper where the intervenor does not itself possess the only substantive legal right it seeks to assert in the action.").
 
 
 19
 The crewmembers argue that the district court went beyond the minimal showing of interest called for under Rule 24, and instead treated the intervention request as a motion for summary judgment on the merits of the crewmembers' claims. The district court, however, is not bound to blindly accept the intervention request:
 
 
 20
 Fifth Circuit precedent establishes that "the inquiry under subsection (a)(2) is a flexible one, which focuses on the particular facts and circumstances surrounding each application.... [and] intervention of right must be measured by a practical rather than a technical yardstick."
 
 
 21
 United States v. Texas Eastern Transmission Corp., 923 F.2d 410, 413 (5th Cir.1991) (quoting United States v. Allegheny-Ludlum Indus., Inc., 517 F.2d 826, 841 (5th Cir.1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976)).
 
 
 22
 The district court was correct to scrutinize the January 1991 agreement to ascertain if the crewmembers met the requirements for Rule 24(a)(2) intervention of right. To permit intervention without looking at the basis for the seamen's request, as the crewmembers argue, would have necessitated further delay in the disposition of assets tied up in the court's registry.[10]
 
 
 23
 III. Tesoreria General's Claim for Unpaid Social Security
 
 Contributions
 
 24
 Tesoreria General and BCI agree that Spanish law governs the substance of Tesoreria General's claim for unpaid social security contributions. Therefore, we must evaluate whether or not Spain recognizes a maritime lien, similar to that given seamen's wage claims, for the claims Tesoreria General now asserts. After Spanish law determines its substantive nature, the law of the forum (U.S.) will rank Tesoreria General's lien claim in the pecking order of the sale proceeds distribution. See Brandon v. S.S. DENTON, 302 F.2d 404, 410-11 (5th Cir.1962).
 
 
 25
 We review questions regarding foreign law de novo. Fed.R.Civ.P. 44.1. This analysis is plenary; a circuit court "owes no deference to the district court's determination of foreign law, and may consider information not available to the district court." Mobile Marine Sales, Ltd. v. M/V PRODROMOS, 776 F.2d 85, 89 (3rd Cir.1985) (citing Kalmich v. Bruno, 553 F.2d 549, 552 (7th Cir.1977)); see generally John R. Brown, "44.1 Ways to Prove Foreign Law," 9 Mar.Law. 179, 195 (1984).[11]
 
 
 26
 Spain's legal system is civilian in nature. Therefore, the role of positive legislation is emphasized at the expense of stare decisis. See Henry v. S/S BERMUDA STAR, 863 F.2d 1225, 1230-32 (5th Cir.1989). To correctly interpret Spanish law, we look first to the text of the legislation, and then to any customs which have developed with respect to its application. Finally, we can turn to judicial decisions to the extent that they fill in gaps left by law or custom. See id. (interpreting Panamanian law according to civilian principles).[12]
 
 
 27
 Tesoreria General advances two lines of reasoning to support its position that Spain confers preferred status on a claim for unpaid social security obligations: First, Tesoreria General contends that Spanish internal law accords unpaid wages and unpaid social security obligations parallel treatment. Second, Spain is a signatory nation to the International Convention for the Unification of Certain Rules Related to Maritime Liens and Mortgages, 100 L.N.T.S. 187, signed in Brussels in 1926, and formally ratified by Spain in 1930 ("Brussels Convention") (reprinted in 6A Benedict on Admiralty 8-17 (7th ed. 1993)). Tesoreria General asserts that this convention is broadly written, and encompasses social security contributions in the section which creates a maritime lien for crew wages. We address these arguments in reverse order.[13]
 
 A. 1926 Brussels Convention
 
 28
 Initially, it is helpful to review the applicable provisions of the 1926 Brussels Convention:
 
 ARTICLE 2
 
 29
 The following give rise to a maritime lien on a vessel, on the freight for the voyage during which the claim giving rise to the lien arises, and on the accessories of the vessel and freight accrued since the commencement of the voyage:
 
 
 30
 * * * * * *
 
 
 31
 2. Claims arising out of the contract of engagement of the master, crew, and other persons hired on board[.]
 
 
 32
 * * * * * *
 
 ARTICLE 3
 
 33
 The mortgages, hypothecations, and other charges on vessels referred to in Article 1 rank immediately after the secured claims referred to in the preceding Article.
 
 
 34
 National laws may grant a lien in respect of claims other than those referred to in the said last-mentioned Article, so, however, as not to modify the ranking of claims secured by mortgages, hypothecations, and other similar charges, or by the liens taking precedence thereof.
 
 
 35
 * * * * * *
 
 PROTOCOL OF SIGNATURE
 
 36
 In the proceeding to the signature of the International Convention for the unification of certain rules relating to maritime liens and mortgages, the undersigned Plenipotentiaries have adopted the present Protocol, which will have the same force and the same value as if the provisions were inserted in the text of the Convention to which it relates:
 
 
 37
 I. It is understood that the legislation of each State remains free
 
 
 38
 1. to establish among the claims mentioned in no. 1 of Article 2, a definite order of priority with a view to safeguarding the interests of the Treasury;....
 
 
 39
 II. There is no impairment of the provisions in the national laws of the contracting States conferring a lien upon public insurance associations in respect of claims arising out of the personnel of vessels.
 
 
 40
 It is Article 2(2)--"Claims arising out of the contract of engagement of the ... crew"--on which Tesoreria General chiefly relies, arguing that the provision's broad scope encompasses all forms of remuneration attributable to the labor of the crew, including social security contributions withheld from a seaman's pay but not remitted to the proper governmental agency. Tesoreria General reads this provision to include social security contributions arguing that, if the drafters had intended to limit Article 2(2)'s coverage only to those sums payable directly to seamen, they would have chosen more restrictive language. Tesoreria General concludes that any claim for which the employer/vessel owner is liable as a result of its contract of employment with a seaman, including nonpayment of social security contributions, is a claim contemplated by Article 2(2). Semantically, then, Tesoreria General equates social security contributions with wages and other forms of compensation.
 
 
 41
 BCI, unsurprisingly, takes a narrower view. It argues that Article 2(2) does not encompass social security contributions, and the Protocol of Signature's provisions make this evident because it leaves undisturbed the right of signatory countries to enact national legislation "conferring a lien upon public insurance associations in respect of claims arising out of the insurance of the personnel of vessels." BCI argues that since Protocol II anticipates that signatory nations have, or may adopt, specific legislation to create liens for public insurance contributions, any notion that the 1926 Convention itself creates such a lien is negated. We believe this view is correct.
 
 
 42
 In countries which recognize that unpaid social insurance contributions create a preferred maritime lien, specific legislation has been adopted. See International Maritime Organization/United Nations Conference on Trade and Development, "Consideration of Maritime Liens and Mortgages and Related Subjects, in Accordance with the Terms of Reference of the Joint Intergovernmental Group," U.N. Doc. TD/B/C.4/AC.8/6 (April 9, 1987).[14]
 
 
 43
 The JIGE IMO/UNCTAD report lists fifty-two countries and identifies the various maritime liens each recognizes by national legislation. Only twelve of those countries listed recognize a lien for social security contributions. Of the twenty-one listed countries that are also parties to the 1926 Brussels Convention, only three (Belgium, France, and Italy) recognize a lien for social security contributions. Furthermore, the explanatory appendix to the table of countries discusses "wages" and "social insurance contributions" in separate sections:
 
 Wages
 
 44
 Wages and other sums due to the master, officers and other members of the vessel's complement in respect of their employment on the vessel (article 4, paragraph 1(i) of the 1967 Convention, and of the CMI Lisbon Draft; see also article 2, paragraph 2 of the 1926 Convention).Social insurance contributions
 
 
 45
 Social insurance contributions payable on behalf of the master, officers and other members of the vessels complement (article 4, paragraph 1(i) CMI Lisbon Draft).
 
 
 46
 (Emphasis added). The JIGE's report indicates that the 1967 Convention and the 1926 version indisputably provide that wage claims give rise to maritime liens. Note that the section on wages makes reference to both the 1926 and the 1967 Conventions. No reference to either Convention is made in the section dealing with social insurance contributions. Reference is made only to the "Lisbon Draft", and not to any Convention currently in force. We conclude that this indicates that the IMO/UNCTAD intergovernmental group of experts did not consider that social insurance contributions are entitled to a lien under either the 1926 or the 1967 Brussels Convention.
 
 
 47
 One of the main points of error raised by Tesoreria General on appeal is that the district court erred in relying on the JIGE report. The JIGE, see supra, note 14, was involved in harmonizing differences between the 1926 Brussels Convention and the 1967 Brussels Convention, which also dealt with the unification of rules relating to maritime liens and mortgages.[15] The 1967 Convention's position on liens for social security contributions appears to be narrower than that of its predecessor. Under the 1967 Convention, liens are granted to "wages and other sums due to the master, officers and other members of the vessels complement in respect of their employment on the vessel[.]" 1967 Brussels Convention, art. 4(1)(i) (reprinted in 6A Benedict on Admiralty 8-25 (7th ed. 1993)). The phrasing of this provision ("sums due to the master...."), grants a lien only if money is owed directly to a crewmember, and not to a third party on the crewmember's behalf. See William Tetley, Maritime Liens and Claims 128-29 (1985).
 
 
 48
 The JIGE was dealing with two divergent provisions on social insurance contributions, and Tesoreria General maintains that the resulting IMO/UNCTAD report was speaking only to the narrower provisions of the 1967 Brussels Convention, of which Spain is not a party. Consequently, Tesoreria General argues, the district court's decision was based upon inapplicable information. We conclude that the report, while discussing two different international conventions, clearly distinguishes between the two agreements.[16]
 
 B. French Legislation
 
 49
 Our interpretation of Spanish law, vis-a-vis the 1926 Brussels Convention, is also guided by looking to the actions of other signatory nations.[17] Protocol II of the 1926 Convention preserved the right of signatory states to enact legislation regarding liens for contributions due to public insurance associations. French law is illustrative on this point, as France has adopted specific legislation on the lien status accorded social security contributions. See Case No. 91-3922 R. vol. 6, at 1790-91 (Affidavit of Patrick Thieffry). In fact, France has adopted the language of Article 2(2) almost verbatim.
 
 
 50
 Tesoreria General argues that by adopting the language of Article 2(2), French law demonstrates that the 1926 Convention itself creates a maritime lien for social security contributions. Tesoreria General further contends that we should infer that by assimilating the language of Article 2(2) wholesale, France's actions illustrate that a signatory country need not enact its own distinctly worded legislation conferring privileged status to a lien for unpaid social insurance contributions. We are not persuaded by this reasoning.
 
 
 51
 France has enacted specific legislation on this matter, while Spain's legislature did not address this issue until recently.[18] Whatever the wording of the French law, the simple fact that France deemed it necessary to legislatively create a lien for unpaid social security contributions illustrates that such legislative action was necessary under the terms of the 1926 Convention. We believe that this supports the conclusion that the 1926 Convention, standing on its own, does not give rise to the preferred lienholder status that Tesoreria General now seeks.
 
 C. Spain's Internal Legislation
 
 52
 Turning to a review of Spain's internal law, Tesoreria General argues that Spain grants a "super privilege" to unpaid social security contributions, and that a Spanish court, if called upon to extend this privilege in a maritime context, would certainly do so. The affidavit of Professor J.L. Rodriguez Carrion was offered by Tesoreria General in support of this position. This affidavit, however, is at best inconclusive. Rodriguez Carrion has drawn an analogy between statutes according preferential treatment for social security payments and laws which provide this status for tax debts. See Case No. 91-3922 R. vol. 6, at 1824 (Affidavit of Professor J.L. Rodriguez Carrion). Equating delinquent tax payments with unpaid social security contributions undermines Tesoreria General's efforts to characterize its claim as equivalent to one for "wages."
 
 IV. Digression Into the Familiar
 
 53
 When the parties have failed to conclusively establish foreign law, a court is entitled to look to its own forum's law in order to fill in any gaps. See Cantieri Navali Riuniti v. M/V SKYPTRON, 802 F.2d 160 (5th Cir., 1996):
 
 
 54
 This practice has been approved by this Circuit and by leading commentators on choice of law. In Symonette Shipyards Ltd. v. Clark, 365 F.2d 464, 468 (5th Cir.1966), we noted that "[i]n the absence of sufficient proof to establish with reasonable certainty the substance of the foreign principles of law, the modern view is that the law of the forum should be applied." Professors Scoles and Hay adopt a similar view in their treatise. E. Scott and P. Hay, Conflict of Laws § 12.19 (1982) ("[I]t is better to abandon the terminology of presumption and simply say that where foreign law is not proved the court applies ... local law.").
 
 
 55
 Id. at 163 n. 5. In the instant case we need not turn to American maritime law as a substantive device because we hold that the 1926 Brussels Convention, as the applicable law of Spain, does not create a lien (preferred or otherwise) for unpaid social security contributions. American maritime law, however, provides a background against which we can analyze Tesoreria General's attempts to characterize its claim for unpaid social security contributions as one for "wages."
 
 
 56
 Many of the American cases in which parties, other than seamen, seek to assert a "wage" lien involve employer contributions to employee benefit plans. See, e.g., Citibank, N.A. v. M/V AMERICAN MAINE, 865 F.2d 24, 28 (2nd Cir.1988); West Winds, Inc. v. M/V RESOLUTE, 720 F.2d 1097, 1100-01 (9th Cir.1983), cert. denied, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984); Barnouw v. S.S. OZARK, 304 F.2d 717, 719-20 (5th Cir.), cert. denied, 371 U.S. 923, 83 S.Ct. 291, 9 L.Ed.2d 231 (1962). Uniformly, American courts have denied liens equivalent to the wage lien to nonseamen asserting such claims: "Every published opinion addressing employer contributions to pension-type benefit plans ... has concluded that such contributions are not 'wages of the crew'." Prudential Ins. v. U.S. Lines, Inc., 915 F.2d 411, 412 (9th Cir.1990).
 
 
 57
 At the heart of these decisions is the insurmountable obstacle that Tesoreria General cannot overcome, under Spanish or American maritime law. Unpaid social insurance or pension contributions are not "wages of the crew" because they are due to a third party vicariously through the seamen's labors; the seamen themselves have no claim to their employer's contributions. See Prudential Ins., 915 F.2d at 412; M/V AMERICAN MAINE, 865 F.2d at 28; Long Island Tankers Corp. v. S.S. KAIMANA, 265 F.Supp. 723, 726 (N.D.Cal.1967), aff'd, 401 F.2d 182 (9th Cir.1968), cert. denied, 393 U.S. 1095, 89 S.Ct. 879, 21 L.Ed.2d 785 (1969).
 
 
 58
 The District Court of Alaska recently reiterated the cogency of this reasoning. See Kesselring v. F/T ARCTIC HERO, 1993 AMC 447, 1992 WL 470510 (D.Alaska 1993). In Kesselring, the United States Government argued that unpaid withholding taxes taken from the crew's pay created a maritime lien for crew wages in the Government's favor. The court termed this effort "bootstrapping," and held: "There is no case law or other authority supporting the proposition that crew wages encompasses uncollected taxes from monies withheld by an employer." Id. at 448.
 
 
 59
 Under West Winds, Inc. v. M/V RESOLUTE, supra, and Long Island Tankers Corp. v. S.S. KAIMANA, supra, if the seamen can establish a right to an immediate dispersal of benefits, or have suffered a net loss because of their employers' failure to contribute to a benefits plan, a wage lien may lie. See West Winds, Inc., 720 F.2d at 1099; Long Island Tankers Corp.,265 F.Supp. at 726-27. This reasoning could extend to the instant case and might create a lien in Tesoreria General's favor if the crewmembers were personally liable for the unpaid social insurance contributions. Such is not the case here, as Spain's Social Security Law art. 68 § 2 provides that if a deduction is made but not remitted, the employer is exclusively liable for remitting the total contribution.[19]
 
 V. Adequate Time for Discovery
 
 60
 We next address Tesoreria General's claim that the district court abused its discretion in ruling on BCI's motion for summary judgment without affording Tesoreria General adequate time for discovery. A review of the time-frame in which the events of this case transpired convinces us that the district court did not abuse its discretion.
 
 
 61
 This matter was originally in two districts--the Southern District of Texas at Houston, and the Eastern District of Louisiana at New Orleans. The cases were consolidated in the New Orleans forum in January 1991. Tesoreria General had filed its intervention request in September of 1990, shortly before BCI filed its original motion for summary judgment. BCI's motion was stayed indefinitely, but BCI renewed it in February of 1991, after the cases were consolidated. A hearing was set for March 20, 1991. Tesoreria General opposed the resetting of the summary judgment hearing, claiming there was inadequate time for discovery; however, no Rule 56(f) affidavit, setting forth what additional discovery was necessary, accompanied Tesoreria General's opposing motion Fed.R.Civ.P. 56(t).[20] After the March 20, 1991 hearing, the district court twice requested additional briefing on the lien ranking issue. The district court issued its ruling on lien status in July 1991, and a Rule 58 final judgment was entered on August 1, 1991.
 
 
 62
 From the time that it filed an intervention request to the March 1991 hearing on BCI's summary judgment motion, Tesoreria General had over seven months within which to conduct discovery. Granted, the outbreak of the Persian Gulf conflict during this same period made international travel inadvisable. Nevertheless, Tesoreria General, an agency of the Spanish government, was in the unique position of having access to all manner of authorities on Spanish law. Counsel should have been able to coordinate necessary discovery by telephone, facsimile transmissions, and the mails. In-person preparation, while surely preferable to alternative means, was not the only manner in which discovery could have proceeded. No such effort was apparently made.
 
 
 63
 Rule 56 contemplates that the parties will be afforded adequate time to conduct necessary discovery; "This is a very different animal from 'adequate discovery.' " Union City Barge Line, Inc. v. Union Carbide Corp., 823 F.2d 129, 138 n. 21 (5th Cir.1987). No Rule 56(f) motions were presented to the court which could have illustrated what discovery Tesoreria General felt was necessary to refute BCI's motion for summary judgment. See id. at 137 (Fed.R.Civ.P. 56(f) is "tailor-made" for such situations). The district court did not abuse its discretion in hearing BCI's motion.
 
 VI. Summary Judgment
 
 64
 We will affirm a grant of summary judgment "where 'we are convinced, after an independent review of the record, that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' " Hartford Acc. & Indem. v. Costa Lines Cargo Serv., 903 F.2d 352, 362 (5th Cir.1990) (quoting Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States, 832 F.2d 1358, 1364 (5th Cir.1987)) (internal citations omitted). The necessity of sifting through foreign law does not mitigate against the use of summary proceedings:
 
 
 65
 This conclusion seems obvious in light of Rule 44.1's mandate that such a determination "shall be treated as a ruling on a question of law." Thus, even differences of opinion on the content, applicability, or interpretation of the foreign provision may not be characterized as a "genuine issue as to any material fact" under Rule 56.
 
 
 66
 John R. Brown, "44.1 Ways to Prove Foreign Law," 9 Mar.Law. 179, 194 (1984).
 
 VII. Conclusion
 
 67
 Despite the differing interpretations of Spanish law offered by the parties, we conclude that the 1926 Brussels Convention does not create a maritime lien for unpaid social security contributions. Furthermore, the district court did not abuse its discretion in the conduct of the proceedings; adequate time for discovery was provided.
 
 
 68
 The crewmens' intervention request was properly denied. The crewmembers, through their representative Union, assigned their wage claims to BCI by virtue of the January 1991 agreement. Lacking any interest relating to the sale proceeds, which formed the basis of the present action, the crewmembers cannot intervene of right under Rule 24(a)(2).
 
 
 69
 The judgment of the district court is, therefore, AFFIRMED.
 
 
 
 [1]
 Senior District Judge of the Western District of Louisiana, sitting by designation
 
 
 [2]
 The STOLT MARIA PANDO was arrested in Houston, and the STOLT LUISA PANDO was arrested in New Orleans. The proceedings were later consolidated in New Orleans
 
 
 [3]
 The real party in interest is Banco Exterior de Espana, S.A., the successor entity to Banco de Credito Industrial
 
 
 [4]
 The crewmembers did not seek to intervene in the action until January 1992, "on the eve of the hearing concerning substitution of security and distribution of funds--and eighteen months after the vessels were seized." Parcel Tankers, Inc. v. M/T STOLT LUISA PANDO, 787 F.Supp. 614, 616 (E.D.La.1992)
 
 
 [5]
 The funds that were taken from the crew's pay, ostensibly as social security contributions but never remitted to the Spanish government, form the basis of both Appellants' claims. The seaman characterize these withheld funds as wages that are due them
 
 
 [6]
 Fed.R.Civ.P. 24(a) provides:
 Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 
 
 [7]
 This provision extends preferred mortgagee status to foreign creditors "if the mortgage, hypothecation, or similar charge was executed under the laws of the foreign country under whose laws the ownership of the vessel is documented and has been registered under those laws in a public register at the port of registry of the vessel or at a central office." 46 U.S.C. § 31301(6)(B) (Supp.1992)
 
 
 [8]
 See also Parcel Tankers, Inc., 787 F.Supp. at 617 n. 3 (no claim that Union was without authority to act for seamen)
 
 
 [9]
 Though the contract is facially unambiguous, the agreement is further clarified by the circumstances surrounding its confection. The Union was aware that Maritima Antares was liable for back wages, and that BCI was very interested in pursuing a settlement of these potential claims. The Union entered into negotiations on behalf of the affected seamen, and the resulting compromise was approved by an agency of the Spanish government. BCI paid the Union $16 million for potential wage claims, an amount that was curiously close to the seamen's "preliminary estimate" of $17 million due from Maritima Antares in back wages
 
 
 [10]
 The district court discussed the possibility that the crewmembers might have had a viable claim that was independent of the claims settled in the January 1991 agreement. See Parcel Tankers, Inc., 787 F.Supp. at 620. This potential claim would lie only against BCI, by virtue of a July 1990 agreement with the Union to avert labor difficulties following the arrests of Maritima Antares's vessels. Id. The crewmembers were granted limited intervention in the pending action to "prove up" any claims against BCI. No action was taken towards this end, and the crewmembers abandoned this claim on appeal
 
 
 [11]
 Consequently, although the district court declined to review certain affidavits submitted by the parties, we can examine the proffered materials. See Charles Alan Wright, Et Al., 9 Federal Practice and Procedure § 2444 (1971 & Supp.1992)
 
 
 [12]
 Our interpretation is also governed by Fed.R.Civ.P. 44.1, which permits consideration of "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."
 
 
 [13]
 Tesoreria General's position on the role of Spanish internal law in this dispute has not been entirely consistent. At one point Tesoreria General argued: "It is clear that as per the decree of the Spanish Supreme Court of May 22, 1989, the Brussels Convention of 1926 is the sole law presently applicable to the establishment of preferred maritime liens." Case No. 91-3922 R. vol. 5, at 1464 (Tesoreria General's Supplemental Memorandum in Opposition to BCI's Motion for Partial Summary Judgment) (emphasis added)
 In its brief and argument on appeal, however, Tesoreria General has drawn a parallel between the "super privilege" accorded social security contributions under Spain's internal laws, and the preferred status for the maritime lien it now seeks to assert. See Case No. 91-3922 R. vol. 6, at 1824 (Affidavit of Professor J.L. Rodriguez Carrion).
 
 
 [14]
 This Report was written by the Joint Intergovernmental Group of Experts (JIGE) on Maritime Liens and Mortgages and Related Subjects, a cooperative comprised of representatives from the United Nations Conference on Trade and Development (UNCTAD), and the International Maritime Organization (IMO). The cited work is partially contained in the record. Case No. 91-3922 R. vol. 5, at 1582-85. However, the record did not contain the full report--an explanatory appendix was omitted. This appendix was included in the Record Excerpts presented to this Court on appeal. Per Fed.R.Civ.P. 44.1, we are able to consider this material
 
 
 [15]
 Spain is not a party to the 1967 Brussels Convention
 
 
 [16]
 Interestingly, although Tesoreria General paints the work of the IMO/UNCTAD group of experts in a disparaging light, the work of this group was cited favorably by Tesoreria General in their Supplemental Memorandum in Opposition to BCI's Motion for Partial Summary Judgment. See Case No. 91-3922 R. vol. 5, at 1476
 
 
 [17]
 We have been referred to no Spanish judicial decisions interpreting Article 2(2) of the 1926 Brussels Convention
 
 
 [18]
 The Rodriguez Carrion affidavit, discussing a recently passed Spanish statute, states: "Thanks to this new drafting, payments due to Social Security are equivalent to those taxes owed to the province or municipality...." Later, the affidavit observes that "[i]t is lamentable that neither the Spanish legislature nor our Supreme Court, has spoken on the ranking of Social Security contribution credits with relation to the privileged credits of Article 2 of the Brussels Convention of 1926." See Case No. 91-3922 R. vol. 6, at 1824 (Affidavit of Professor J.L. Rodriguez Carrion)
 
 
 [19]
 If the seamen were personally liable for the unpaid social security contributions, Tesoreria General may have been entitled to a lien against the sale proceeds. This reasoning comports with the IMO/UNCTAD JIGE's report on harmonizing the Brussels Conventions: "[C]ontributions due by the master and crew and deducted by the owner but not paid and which, consequently, is claimed by the social insurance institution directly from the master and the crew [,]" would give rise to a maritime lien against a vessel. "Revision of the International Conventions for the Unification of Certain Rules Relating to Maritime Liens and Mortgages, Final Report of the Chairman of the International Sub-Committee," reprinted in Case. No. 91-3922 R. vol. 5, at 1478 (Tesoreria General's Supplemental Memorandum in Opposition to BCI's Motion for Partial Summary Judgment) (emphasis added). Since Tesoreria General cannot recover funds directly from the seamen, there is no basis to impose a lien against the sale proceeds to prevent out-of-pocket losses to the crew
 
 
 [20]
 See Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (Rule 56(f) is appropriate mechanism to deal with premature summary judgment motion); accord Union City Barge Line, Inc. v. Union Carbide Corp., 823 F.2d 129, 138 n. 21 (5th Cir.1987)