Speedway Motorsports Int'l. v. Bronwen Energy Trading, Ltd., 2009 NCBC 3.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
08-CVS-9450

SPEEDWAY MOTORSPORTS INTERNATIONAL
LTD.,

      Plaintiff,

      v.

BRONWEN ENERGY TRADING, LTD.,
BRONWEN ENERGY TRADING UK, LTD., DR.
PATRICK DENYEFA NDIOMU, BNP PARIBAS
(SUISSE) S.A., BNP PARIBAS S.A., SWIFT
AVIATION GROUP, INC., SWIFT AIR, LLC,
SWIFT AVIATION GROUP, LLC, AND SWIFT
TRANSPORTATION CO., INC.

      Defendants.

ORDER & OPINION

*Womble Carlyle Sandridge & Rice, PLLC by James P. Cooney, III, Debbie W. Harden, and Meredith J. McKee for Defendant Swift Aviation Group, Inc.*

*Bell, Davis & Pitt, P.A. by William K. Davis and Edward B. Davis for Defendant BNP Paribas S.A.*

Diaz, Judge.

{1}    Before the Court is the Motion of Defendant BNP Paribas S.A. ("Paribas" or the "Bank") to dismiss the cross-claims of Defendant Swift Aviation Group, Inc. ("SAG"), pursuant to Rule 12(b)(3) of the North Carolina Rules of Civil Procedure ("the Motion").

{2}    Paribas contends that SAG's cross-claims must be litigated (if at all) in Paris, France, pursuant to a mandatory forum selection clause contained in certain contract documents.

{3}    After considering the Court file, SAG's cross-claims, the Motion, and the briefs and supporting materials of the parties, the Court **GRANTS** the Motion,

without prejudice to SAG's right to pursue its claims in the commercial court of Paris, France.

## I.
## PROCEDURAL BACKGROUND

{4}     On 22 April 2008, Plaintiff Speedway Motorsports International, Ltd. ("Speedway") filed its Complaint in Mecklenburg County Superior Court.

{5}     On 26 May 2008, Plaintiff filed an Amended Complaint.

{6}     On 6 June 2008, SAG filed a Notice of Designation designating the case as mandatory complex business.

{7}     On 27 August 2008, SAG answered the Amended Complaint and also filed its cross-claims against Paribas.

{8}     On 25 September 2008, Plaintiff filed its Second Amended Complaint. Neither SAG nor Paribas were required to re-plead in response to the Second Amended Complaint.

{9}     Paribas moved to dismiss SAG's cross-claims on 29 October 2008, and it also filed an accompanying brief.

{10}   SAG filed a brief in opposition on 21 November 2008.

{11}   Paribas filed a reply brief on 11 December 2008.

## II.
## THE FACTS
### A.
### THE PARTIES

{12}   SAG is a holding company organized and existing under the laws of Arizona.  (Cross-Claims ¶¶ 1, 7.)

{13}   SAG's subsidiaries are engaged in the business of transportation, including air transportation.  (Cross-Claims ¶ 7.)

{14}   Paribas is a foreign bank headquartered in Paris, France.  (Cross-Claims ¶ 5.)

{15}    Defendant Bronwen Energy Trading, Ltd. ("Bronwen") is a corporation organized under the laws of the Commonwealth of Dominica.  (Second Am. Compl. ¶ 3.)

B.

THE DISPUTE

{16}    In or around 2007, SAG entered into a series of contracts with the Kuwait Petroleum Company ("KPC")[1] for the right to purchase, load, and deliver certain petroleum products (hereinafter the "petroleum contracts").  (Cross-Claims ¶ 8.)

{17}    To fulfill the petroleum contracts, SAG required financing and logistics help.  (Cross-Claims ¶ 12.)

{18}    Paribas agreed to provide Letters of Credit on behalf of SAG to satisfy KPC's financing requirements.  (Cross-Claims ¶ 17.)

{19}    In return, however, Paribas required that SAG retain Bronwen to assist SAG in performing the petroleum contracts.  (Cross-Claims ¶ 18.)

{20}    Paribas told SAG that:  (1) Paribas had an "active commercial relationship" with Bronwen; (2) Bronwen was a professional, trustworthy, and competent company in the transportation and sale of petroleum products; and (3) Bronwen had a $100 million line of credit through Paribas.  (Cross-Claims ¶¶ 20, 22–23.)

{21}    Purportedly relying on the Bank's representations regarding Bronwen, and because of the Bank's insistence that SAG retain Bronwen to help perform the petroleum contracts, SAG and Bronwen executed a series of Third Party Letter of Credit Agreements (the "Third Party Agreements"), which were submitted to Paribas for approval.  (Cross-Claims ¶ 24.)

{22}    The Bank did not sign the Third Party Agreements.  Nevertheless, the Third Party Agreements:

- are addressed to the Bank;

- set out the Bank's rights under the Third Party Agreements;

---

[1] KPC is not a party to this litigation.

- summarize the terms of the petroleum contracts;

- appoint the Bank as attorney-in-fact for SAG and Bronwen, with authority to "take any and all action in connection with the Letter[s] of Credit or the [petroleum being purchased]";

- state that, with respect to the petroleum contracts and the Letters of Credit, Bronwen will have sole authority to deal with the Bank;

- state that Bronwen has instructed the Bank to issue Letters of Credit to facilitate financing of the petroleum contracts;

- state that SAG and Bronwen are "unconditionally and irrevocably obligated to the Bank on a joint and several basis for any liabilities that may arise from the issuance by the Bank of the Letter(s) of Credit"; and

- provide that the Third Party Agreements "shall be construed in accordance with French Law" and that "[a]ny disputes arising [t]hereunder or in connection [t]herewith shall be exclusively submitted to the commercial court of Paris, France."

(Ans. & Cross-Claims, Exs. 1–6.)

{23}   Speedway also provided financial assistance to SAG and Bronwen for the performance of the petroleum contracts in the form of guarantees to the Bank. (Second Am. Compl. ¶¶ 35–60.)

{24}   The guarantees required Speedway to maintain a collateral account with the Bank.  (Second Am. Compl. ¶ 60.)

{25}   Speedway's Second Amended Complaint alleges, among other things, that (1) SAG and Bronwen breached their agreements with Speedway; and, (2) the Bank made a wrongful demand on the guarantees by improperly debiting $12 million from Speedway's collateral account.  (Second Am. Compl. ¶¶ 77–117, 129–35.)

{26}   In its cross-claims, SAG contends that Bronwen—with the Bank's knowledge and assistance—botched the performance of the petroleum contracts, resulting in over $21 million in losses.  (Cross-Claims ¶¶ 44–56.)

{27}   SAG asserts claims against the Bank for breach of fiduciary duty and fraud, contending that the Bank misrepresented Bronwen's financial *bona fides* and

its ability to perform the petroleum contracts, in part because the Bank stood to benefit financially from requiring SAG to retain Bronwen to perform the petroleum contracts. (Cross-Claims ¶¶ 57–72.)

{28} SAG also asserts claims against Bronwen for (1) breach of the duty of good faith and fair dealing with respect to the latter's obligations under the Third Party Agreements, and (2) fraud and conversion for Bronwen's alleged unlawful diversion of fuel shipments that it was obligated to process for SAG's benefit under the Third Party Agreements. (Cross-Claims ¶¶ 50, 73–94.)

{29} Paribas alleges that it covered the over $21 million loss resulting from the performance of the petroleum contracts pursuant to its obligations to KPC under the Letters of Credit. (Cross-Claims ¶ 55.) In separate litigation pending in the commercial court of Paris, France, Paribas has asserted claims against SAG and Bronwen to recover this amount. (Charabati Aff. ¶ 3; Charabati Aff., Ex. A.)

### III.
### THE PARTIES' CONTENTIONS

{30} Paribas contends the terms of the Third Party Agreements require SAG to pursue its cross-claims in the commercial court of Paris, France. (Paribas' Br. Supp. Mot. Dismiss Cross-Claims 1.)

{31} According to Paribas, the forum selection clauses in the Third Party Agreements are sufficiently broad so as to sweep within their scope SAG's claims that Paribas (1) fraudulently induced SAG to enter the Third Party Agreements, and (2) breached its fiduciary duties to SAG with respect to performance of the petroleum contracts. (Paribas' Br. Supp. Mot. Dismiss Cross-Claims 1, 6–8; Paribas' Reply Br. Supp. Mot. Dismiss Cross-Claims 2, 5–7.)

{32} SAG responds that its cross-claims are properly before this Court for the following reasons: (1) Paribas never signed the Third Party Agreements and, therefore, cannot rely on the forum selection clauses contained therein; (2) in any event, SAG's cross-claims sound in tort and, therefore, do not arise under, nor are they sufficiently connected with, the Third Party Agreements so as to require that

they be litigated in a French commercial court; and (3) forcing SAG to litigate in France would be unfair and unreasonable under the circumstances. (SAG's Opp. Br. Mot. Dismiss Cross-Claims 2–3.)

IV.

PRINCIPLES OF LAW

A.

CHOICE OF LAW PROVISIONS

{33}  A "choice of law" contract clause provides "that the substantive laws of a particular state [shall] govern the construction and validity of the contract." *Cable Tel Servs., Inc. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 641, 574 S.E.2d 31, 33 (2002).

{34}  The general rule in North Carolina is that "where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980).

{35}  Our courts, however, will not enforce a choice of law provision where

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of applicable law in the absence of an effective choice of law by the parties.

*Cable Tel*, 154 N.C. App. at 642–43, 574 S.E.2d at 33–34 (*citing Restatement (Second) of Conflict of Laws* § 187 (1971)).

{36}  North Carolina Rule of Civil Procedure 44.1 addresses a trial court's determination of foreign law. It provides:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or by other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Chapter 8 of the General

Statutes and State law.  The court's determination shall be treated as a ruling on a question of law.

N.C. R. Civ. P. 44.1 (2007).

{37}   Because our appellate courts have not addressed this rule, the Court may look to federal cases interpreting the analogous Federal Rule of Civil Procedure. *See Turner v. Duke Univ.*, 325 N.C. 152, 164, 381 S.E.2d 706, 713 (1989) (stating that, because the North Carolina Rules of Civil Procedure are substantially similar to the Federal Rules, our courts often look to federal cases for interpretive guidance).

{38}   Federal Rule of Civil Procedure 44.1 "provides courts with broad authority to conduct their own independent research to determine foreign law but imposes no duty upon them to do so."  *Bel-Ray Co., Inc. v. Chemrite Ltd.*, 181 F.3d 435, 440 (3d Cir. 1999).

{39}   In cases before the federal courts, the parties "carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case." *Id.* at 440–41 (*citing Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 221 (7th Cir. 1996); *Restatement (Second) of Conflict of Laws* § 136 cmt. f).

{40}   "Where parties fail to satisfy either burden the court will ordinarily apply the forum's law."  *Id.* at 441 (*citing Banco de Credito Indus., S.A. v. Tesoreria General de la Seguridad Social de Espana*, 990 F.2d 827, 837 (5th Cir. 1993); *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 205 (1st Cir. 1988); *Commercial Ins. Co. of Newark, N.J. v. Pacific-Peru Constr. Corp.*, 558 F.2d 948, 952 (9th Cir. 1977); *Walter v. Neth. Mead, N.V.*, 514 F.2d 1130, 1137 n.14 (3d Cir. 1975); *Restatement (Second) of Conflict of Laws* § 136 cmt. h).

B.

FORUM SELECTION CLAUSES

{41}   A mandatory forum selection clause "designates a particular state or court as the jurisdiction in which the parties will litigate disputes arising out of the

contract and their contractual relationship." *Johnston County v. R.N. Rouse & Co., Inc.*, 331 N.C. 88, 93, 414 S.E.2d 30, 33 (1992).

{42} Our "Supreme Court has held that forum selection clauses are valid and enforceable *except* when compelling reasons dictate otherwise." *Sec. Credit Leasing, Inc. v. D.J.'s of Salisbury, Inc.*, 140 N.C. App. 521, 528–29, 537 S.E.2d 227, 232 (2000) (*citing Perkins v. CCH Computax, Inc.*, 333 N.C. 140, 146, 423 S.E.2d 780, 784 (1992)).[2]

{43} Thus,

> [a] plaintiff who executes a contract that designates a particular forum for the resolution of disputes and then files suit in another forum seeking to avoid enforcement of a forum selection clause carries a heavy burden and must demonstrate that the clause was the product of fraud or unequal bargaining power or that enforcement of the clause would be unfair or unreasonable.

*Perkins*, 333 N.C. at 146, 423 S.E.2d at 784.


V.

ANALYSIS

A.

CHOICE OF LAW ISSUE

{44} Before turning to the merits of the Motion, the Court must first determine the applicable law.

{45} The Bank's principal contention is that the Third Party Agreements—and in particular, the forum selection clauses contained therein—require SAG to litigate its cross-claims in a French court.

{46} Those same Third Party Agreements state expressly that the agreements are to be "construed in accordance with French Law[.]" (Ans. & Cross-Claims, Ex. 4, at 3.)

---

[2] *Perkins* has been superseded in part by statute. *See* N.C. Gen. Stat. § 22B-3 (2007); *Szymczyk v. Signs Now Corp.*, 168 N.C. App. 182, 186 n.2, 606 S.E.2d 728, 732 n.2 (2005). The statute provides that (with limited exceptions) forum selection clauses contained in contracts entered into in North Carolina are void and unenforceable. N.C. Gen. Stat. § 22B-3. In this case, however, neither party asserts that the Third Party Agreements were entered into in North Carolina.

{47} In this case, there appears to be a reasonable basis for applying French law to the Third Party Agreements, as Paribas is a French bank with its headquarters in Paris, France. Moreover, although SAG contends that being forced to litigate its cross-claims in a French commercial court violates North Carolina public policy (an argument the Court addresses later in this opinion), neither party contends that applying French substantive law to the Third Party Agreements runs afoul of the policy of any other state with a materially greater interest in the dispute than France.

{48} The parties, however, have not provided this Court with any authority or evidence from which it might discern how French law would evaluate the validity and scope of the forum selection clauses in the Third Party Agreements.

{49} Accordingly, the Court relies instead on North Carolina law to resolve the Motion. *Accord Bel-Ray Co.*, 181 F.3d at 440–41.

B.

IS SAG BOUND BY THE FORUM SELECTION CLAUSES?

{50} SAG does not dispute that it signed the Third Party Agreements and that they contain mandatory forum selection clauses compelling litigation in the commercial court of Paris, France.

{51} SAG nevertheless opposes litigation in a French court on three grounds: (1) the Bank did not sign the Third Party Agreements and, therefore, may not rely on the forum selection clauses to compel litigation of SAG's cross-claims in France; (2) the scope of the forum selection clauses do not reasonably encompass SAG's cross-claims against the Bank; and (3) forcing SAG to litigate its cross-claims in a French court violates North Carolina public policy. (SAG's Opp. Br. Mot. Dismiss Cross-Claims 7–17.)

{52} The Court does not agree.

{53} As to SAG's first contention, it is true that the Bank did not sign the Third Party Agreements, but the Court holds that this omission does not foreclose the Bank's enforcement of the forum selection clauses.

{54}    The Court has found no authority that directly addresses this issue, and the parties cite none.  Nevertheless, several analogous principles of North Carolina law support the Bank's position.

{55}    First, to the extent a contract must be in writing to be enforceable, the only signature required on the writing is that of "'the party to be charged therewith.'" (Paribas' Br. Supp. Mot. Dismiss Cross-Claims 7–8 (*quoting* N.C. Gen. Stat. §§ 22-1 to 22-5 (2007)).)

{56}    SAG does not dispute that it signed the Third Party Agreements containing the mandatory forum selection clauses.  Accordingly, the Bank's failure to sign the Third Party Agreements does not (standing alone) bar it from demanding that SAG litigate its cross-claims in Paris, France.

{57}    Second, our appellate courts have held, in the context of contracts containing arbitration provisions, that

> "[t]he obligation and entitlement to arbitrate does not attach only to one who has personally signed the written arbitration provision. Rather, well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties."

*Ellen v. A.C. Schultes of Md., Inc.*, 172 N.C. App. 317, 320, 615 S.E.2d 729, 732 (2005) (*quoting Wash. Square Sec., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004)) (internal quotation marks omitted).

{58}    Among these common law principles is the view that a nonsignatory to a contract may, on grounds of equitable estoppel, invoke an arbitration provision contained therein where there is a "close relationship between the entities involved" and where the claims against the nonsignatory are "'intimately founded in and intertwined with the underlying contract obligations.'"  *Sunkist Soft Drinks v. Sunkist Growers*, 10 F.3d 753, 757 (11th Cir. 1993) (*quoting McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., Inc.*, 741 F.2d 342, 344 (11th Cir. 1984)).  *See also Brantley v. Republic Mortgage Ins., Co.*, 424 F.3d 392, 395–96 (4th Cir. 2005) (stating that equitable estoppel applies with respect to arbitration provisions when (1) a signatory to the contract containing an arbitration clause must rely on the

terms of the agreement to assert claims against a nonsignatory, or (2) a signatory to the contract raises allegations of substantially interdependent misconduct by both a nonsignatory and one or more signatories to the contract (*quoting MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999))).

{59}   Given the strong seal of approval that our Supreme Court has given to contract clauses requiring litigation in a foreign jurisdiction (at least where the contract is not entered into in North Carolina), and the heavy burden placed on parties wishing to avoid them, *see Perkins*, 333 N.C. at 146, 423 S.E.2d at 784, the Court concludes that the common law principles applied in North Carolina to extend the reach of arbitration agreements may also be applied to forum selection clauses.

{60}   In this case, SAG negotiated directly with the Bank for Letters of Credit to finance the petroleum contracts.  Those negotiations, in turn, led SAG and Bronwen to execute Third Party Agreements addressed directly to the Bank, whereby (1) SAG confirmed that it had retained Bronwen to assist it in performing the petroleum contracts, and (2) both SAG and Bronwen assumed unconditional obligations to the Bank for any liabilities that might arise from the Bank's issuance of the Letters of Credit.

{61}   Moreover, the Third Party Agreements are replete with language outlining the Bank's contractual rights *vis-à-vis* SAG and Bronwen.

{62}   As a result, the Court holds that the Bank may properly seek to enforce the forum selection clauses in the Third Party Agreements.

{63}   SAG next contends that the forum selection clauses were never intended to apply to what SAG characterizes as the Bank's "unrelated tortious conduct."  (SAG's Opp. Br. Mot. Dismiss Cross-Claims 10.)

{64}   As the Bank points out, however, SAG's attempt to parse its tort claims from the scope of the forum selection clauses is belied by SAG's Answer & Cross-Claims, which attaches the Third Party Agreements and quotes extensively from the contract documents as part of the factual basis for SAG's claims against the Bank.  (Paribas' Reply Br. Supp. Mot. Dismiss Cross-Claims 5.)

{65} This is not surprising given that SAG's cross-claims arise from the Bank's alleged misrepresentations regarding Bronwen's competence and capability to perform the petroleum contracts, which were financed via the Third Party Agreements, as well as the Bank's alleged failure to honor its fiduciary duties with regard to the petroleum contracts.

{66} SAG's interpretation of the forum selection clauses is also at odds with the plain language of the provisions, which require litigation in France of "[a]ny disputes arising [under the Third Party Agreements] or in connection [t]herewith." (Ans. & Cross-Claims, Ex. 4, at 3 (emphasis added).)

{67} This broad language easily encompasses SAG's tort claims because they have their genesis in the Third Party Agreements and related petroleum contracts. *Cf. McBro Planning*, 741 F.2d at 344 (stating that "it is well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than in contract").

{68} Additionally, SAG specifically alleges in its cross-claims that Bronwen's misconduct with respect to the petroleum contracts was facilitated by the Bank. (Cross-Claims ¶¶ 47, 49–50.) This allegation alone provides a separate equitable ground for allowing the Bank to invoke the forum selection clauses in the Third Party Agreements. *Cf. Brantley*, 424 F.3d at 395–96.

{69} In sum, on these facts, the Court is hard-pressed to imagine a closer relationship between parties and alleged wrongs that would justify extending the reach of a mandatory forum selection clause so as to require litigation of all claims related to the dispute in one venue.

{70} Finally, the Court discerns no public policy concerns that justify relieving SAG from the reach of the mandatory forum selection clauses.

{71} SAG's burden on this issue is a heavy one, requiring a showing that "the clause was the product of fraud or unequal bargaining power or that enforcement of the clause would be unfair or unreasonable." *Perkins*, 333 N.C. at 146, 423 S.E.2d at 784.

{72} SAG argues that it was compelled to sign agreements that "were 'wholly one-sided,' placing all of the power in the hands of Bronwen and [the Bank] and leaving [SAG] without any practical recourse." (SAG's Opp. Br. Mot. Dismiss Cross-Claims 14.)

{73} There is, however, no evidence in the record to support SAG's claim. To the extent that SAG relies on the terms of the Third Party Agreements to support its argument, the Court concludes that the agreements, while certainly giving the Bank substantial rights, are alone insufficient to meet SAG's heavy burden to show fraud or overreaching.

{74} The Court also rejects SAG's contention that being forced to litigate in a French commercial court is unreasonable or unfair.

{75} The principal cause for SAG's dissatisfaction with a French venue is that it will be deprived of the full scope of discovery that would otherwise be available in this Court. (SAG's Opp. Br. Mot. Dismiss Cross-Claims 14; Badier Aff. ¶¶ 4–9.)

{76} SAG, however, provides no authority—and the Court has found none—for the proposition that merely requiring a party to litigate in a forum with substantially different discovery rules than those applied in a U.S. court is sufficient cause to override the parties' choice of forum.

{77} While it may be that a French commercial court is a less-than-ideal venue (at least from SAG's perspective), SAG has not shown that enforcing the mandatory forum selection clauses will deprive it of its day in court or leave it without an adequate remedy.

{78} Accordingly, the Court declines to relieve SAG from the reach of the mandatory forum selection clauses.

## VI.
## CONCLUSION

{79}   The Court **GRANTS** the Bank's Motion to Dismiss SAG's cross-claims, without prejudice to SAG's right to pursue its claims in the commercial court of Paris, France.

**SO ORDERED**, this the 18th day of February, 2009.